IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| United States of America,<br><br>          Plaintiff,<br><br>vs.<br><br>Walter William Cartwright III,<br><br>          Defendant. | Case No. 1:22-cr-00081 |

**ORDER DENYING MOTION TO SUPPRESS**

**INTRODUCTION**

[¶ 1] THIS MATTER comes before the Court on a Motion to Suppress filed by the Defendant on March 17, 2023. Doc. No. 40. The United States filed a Response to Defendant's Motion on March 31, 2023. Doc. No. 43. The Defendant filed a Supplement to his Motion on August 7, 2023. Doc. No. 67. A suppression hearing was held on August 18, 2023. For the reasons set forth below, the Motion to Suppress is **DENIED**.

**BACKGROUND**

[¶ 2] The facts in this case are taken from the testimony at the hearing, the exhibits provided by the United States, which includes video of the traffic stop, and the briefs before the Court. Doc. Nos. 40, 41, 43-1-2, 67.

[¶ 3] On August 7, 2019, Chief Al Schmidt ("Chief Schmidt") of the Berthold Police Department saw Defendant Walter Cartwright ("Cartwright") driving his vehicle in a public area. This was not Chief Schmidt's first encounter with Cartwright. In June 2019, he issued Cartwright a citation for

Driving under Suspension.[1] He also knew it would be difficult for Cartwright to address the suspension while he remained in North Dakota because his license was revoked by another jurisdiction. Previously, a law enforcement officer informed Chief Schmidt about Cartwright's criminal history and violent behavior. At that time, Chief Schmidt believed Cartwright had a suspended license and knew that Cartwright had a court hearing to address his suspended license that same day. After this, Chief Schmidt saw Cartwright park his vehicle at the Cenex gas station on Highway 52 near Carpio, North Dakota. Doc. Nos. 40, 43-1. Based on what he knew of Cartwright's driver's license status, Chief Schmidt pulled in behind the Defendant's car parked at the gas station. Doc. No. 43-2.

[¶ 4]  When Chief Schmidt approached, Cartwright got out of his vehicle. Id. at 0:10. Chief Schmidt was aware of Cartwright's felony status, history of drug use, and violent, erratic behavior, so he drew his firearm and ordered Cartwright back into his vehicle. Id.; Doc. No. 43-1. Once Chief Schmidt secured the scene and ensured his safety, he re-holstered his firearm. Doc. No. 43-2 at 0:20. Without prompting, Cartwright asked Chief Schmidt if he knew Cartwright was there to meet someone as part of a cooperative deal.[2] Id. at 0:37. Chief Schmidt ordered Cartwright to step out of the vehicle, but Cartwright talked over Chief Schmidt, stating he was there to trade a firearm for drugs. Id. at 1:00-1:07.

[¶ 5]  After a brief discussion on the purported guns-for-drugs controlled deal, Chief Schmidt read the Defendant his Miranda warning. Id. at 1:43-53. While Chief Schmidt did not ask

---

[1] At the hearing, Chief Schmidt testified he was originally mistaken as to when he verified Cartwright's suspended license. He believed at the time he encountered Cartwright only days before the stop. However, the last contact he had with Cartwright was less than two months prior to the stop in June 2019.
[2] Prior to the stop here, Chief Schmidt had intermittent discussions with Cartwright about potentially cooperating in a criminal investigation, however, nothing came to fruition.

Cartwright if he understood, Cartwright nodded along in understanding as the Miranda warning was given, which gave Chief Schmidt the impression Cartwright understood. Id. After the warning, Cartwright continued to speak and answer questions posed by Chief Schmidt without objection. Id. at 1:54-2:20. During the post-Miranda conversation, Cartwright admitted there was a firearm in the vehicle and that he is a felon. Id.

[¶ 6] After this admission, Chief Schmidt searched the vehicle for the firearm. Chief Schmidt observed the firearm on the back seat of the vehicle. Id. at 3:46-4:18. It was a fully-automatic "UZI." Id. When he found the firearm, Chief Schmidt placed Cartwright in his patrol car and notified Dispatch about the situation. Id. at 5:25-6:30. Chief Schmidt then began driving around the parking lot to ensure his safety and to see if the additional suspect would arrive for the alleged deal. Id. at 6:30-7:50. Chief Schmidt pulled in behind Cartwright's car and checked his driving status. Id. at 7:50-8:24. Dispatch confirmed Cartwright's license was revoked in Missouri. Id. at 8:54-9:00. Chief Schmidt subsequently performed a full search of the vehicle and took possession of the firearm. Id. at 12:45.

## DISCUSSION

[¶ 7] Cartwright argues the evidence found in the search of his vehicle and his admissions during the stop should be suppressed for five reasons. First, he contends there was not probable cause to conduct the traffic stop. Second, he argues he was in custody when Chief Schmidt drew his firearm and the statements he made were without being given a Miranda warning. Third, Cartwright claims the Miranda warning given was insufficient and he did not knowingly, intelligently, and voluntarily waive his rights. Fourth, Chief Schmidt employed a two-step interrogation technique to avoid Miranda and obtain a confession. Finally, Cartwright argues Chief Schmidt unreasonably prolonged the stop. Doc. Nos. 41, 67.

[¶ 8] The United States argues (1) the traffic stop was based upon reasonable suspicion; (2) Cartwright was not in custody before Chief Schmidt read the Miranda warning; and (3) even if Cartwright was in custody and had not been given a Miranda warning, the public safety exception applies. Doc. No. 43. Generally, the Court agrees with the United States.

I.  **Reasonable Suspicion for the Traffic Stop.**

[¶ 9] Cartwright argues Chief Schmidt did not have probable cause because Chief Schmidt did not check his driver's license status before the stop. Doc. No. 41 at 4. The United States argues the traffic stop was based on Chief Schmidt's personal knowledge of Cartwright's suspended license and his pending charges for driving under suspension. Doc. No. 43 at 2. The Court agrees with the United States.

[¶ 10] The Fourth Amendment, as applied to the states through the Fourteenth Amendment, protects the right of people to be secure "against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop constitutes a seizure under the Fourth Amendment." United States v. $45,000.00 in U.S. Currency, 749 F.3d 709, 715 (8th Cir. 2014) (quoting United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008)). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. (quoting Wren v. United States, 517 U.S. 806, 810 (1996)). "Any traffic violation, however minor, provides probable cause for a traffic stop." Id. (quoting United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (en banc)). "[T]he critical inquiry in a probable-cause determination in the traffic-stop context is what the stopping officer observed before pulling over a motorist." $45,000.00 in U.S. Currency, 749 F.3d at 715.

[¶ 11] However, probable cause is not required to conduct an investigative traffic stop—officers only need reasonable suspicion to justify an investigative traffic stop. United States v. Gaffney,

789 F.3d 866, 868 (8th Cir. 2015). Reasonable suspicion is less than proof by a preponderance of the evidence and much less than what is required for probable cause. Kansas v. Glover, 140 S. Ct. 1183, 1187 (2020). "Reasonable suspicion exists when an officer has a 'particularized and objective basis for suspecting the particular person stopped of breaking the law.'" Id. (quoting Heien v. North Carolina, 574 U.S. 54, 60 (2014)). The determination of whether reasonable suspicion existed looks at "what the officer reasonably knew at the time," and "in the light of the officer['s] 'experience and specialized training.'" Id.; United States v. Yang, 345 F.3d 650, 655 (8th Cir. 2003). "[T]he determinative question [for the court when assessing the reasonableness of a traffic stop] is not whether a traffic violation had actually occurred, but 'whether an objectively reasonable police officer could have formed a reasonable suspicion that [the driver] was committing a code violation.'"). United States v. Cox, 992 F.3d 706, 709 (8th Cir. 2021). "Mistakes of law or fact, if objectively reasonable, may still justify a valid stop." Gaffney, 789 F.3d at 868. "If there is an 'articulable and reasonable suspicion that a motorist is unlicensed . . .' a traffic stop on that basis is not unreasonable under the Fourth Amendment." U.S. v. Chartier, 772 F.3d 539, 543 (8th Cir. 2014).

[¶ 12] Chief Schmidt observed and recognized Cartwright operating a motor vehicle. Chief Schmidt testified he also knew Cartwright's license was suspended out of Missouri and that it would be difficult for Cartwright to reinstate his driving privileges while he remained in North Dakota. This provided Chief Schmidt an articulable and objective basis to commence the stop to determine Cartwright's driving status. See Chartier, 772 F.3d at 543 (finding if there is an articulable and reasonable suspicion a motorist is unlicensed, a traffic stop is not unreasonable); Doc. No. 43. While Chief Schmidt was mistaken as to when he had last verified Cartwright's driving status, his honest mistake of fact still provides reasonable suspicion to initiate the traffic

stop because Chief Schmidt knew Cartwright's license was suspended out of Missouri and he had a court hearing that day on his license status. See Gaffney, 789 F.3d at 868 ("Mistakes of law or fact, if objectively reasonable, may still justify a valid stop.").

[¶ 13]   Importantly, Chief Schmidt was not required to determine whether Cartwright was actually in violation of North Dakota's driving under suspension statute. See Cox, 992 F.3d at 709 (noting the question for the court to consider is not whether a traffic violation occurred, but whether an objectively reasonable police officer could have formed reasonable suspicion a traffic violation occurred). This is because an officer does not need actual proof a crime has been committed. Id. Chief Schmidt only needed enough facts to justify an investigative stop to determine if a crime has been committed. Id.; see also Chartier, 772 F.3d at 543

[¶ 14]   Based upon the foregoing, the Court concludes Chief Schmidt had a reasonable suspicion Cartwright was driving with a suspended license, justifying the initial stop.

## II. Statements Made by Cartwright Prior to Being Read His Miranda Rights.

[¶ 15]   Cartwright argues Chief Schmidt's initial show of force effectively put him in custody when the traffic stop began. Doc. 41 at 5-10. The United States argues Cartwright was not in custody at the beginning of the traffic stop, all information was volunteered by Cartwright, and the questions Chief Schmidt asked are within the scope of the traffic stop. Doc. 43 at 4. The Court agrees with the United States insofar as the statements made by Cartwright were volunteered and not subject to custodial interrogation.

[¶ 16]   Under the Fifth Amendment of the Constitution, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Const. amend. V. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him . . . ." Miranda v. Arizona, 384 U.S. 436, 444 (1966). Warnings

are required when interrogation is initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any meaningful way. United States v. Rooney, 63 F.3d 1160, 1167 (8th Cir. 2023) (quoting Miranda, 384 U.S. 436 (1966) (internal quotations omitted)). "The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers of the persons being questioned." United States v. Hephner, 103 Fed. App'x. 41, 48 (8th Cir. 2004) (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). Voluntary statements unprompted by interrogation are admissible with or without Miranda warnings. United States v. Bailey, 831 F.3d 1035, 1038 (8th Cir. 2016) (citing United States v. McGlothen, 556 F.3d 698, 701 (8th Cir. 2009)).

[¶ 17]   "[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." Williams v. Decker, 767 F.3d 734, 740 (8th Cir. 2014) (citing United States v. Fisher, 364 F.3d 970, 973 (8th Cir. 2004)). In discerning whether these actions meet the Fourth Amendment's standard of reasonableness, "the issue is whether the officer has an objectively reasonable concern for officer safety or suspicion of danger." United States v. Smith, 645 F.3d 998, 1003 (8th Cir. 2011).

[¶ 18]   A determination of custody pre-Miranda is not needed in this case as the statements made by Cartwright were not the result of custodial interrogation. See Bailey, 831 F.3d at 1038 ("Voluntary statements unprompted by interrogation are admissible with or without Miranda warnings."). Before Chief Schmidt could barely get a word out, Cartwright talked over Chief Schmidt and stated he was there to exchange a gun for drugs on a controlled buy. Id.; Doc. No. 43-2 at 1:03-10. Cartwright offered this information without prompting from Chief Schmidt. Doc.

No. 43-2 at 1:03-10. Chief Schmidt allowed Cartwright to speak without interruption, but eventually read Cartwright his Miranda rights. Id. at 1:03-57. Considering Chief Schmidt's knowledge of Cartwright's criminal history and violent behaviors, Chief Schmidt was also justified in drawing his firearm for safety purposes when Cartwright exited his vehicle unprompted. See Decker, 767 F.3d at 740 (holding when officers are presented with danger when carrying out an investigative detention, they may brandish their weapon in order to control the scene and protect their safety). This provided Chief Schmidt with an objectively reasonable concern for his safety that justified using his firearm as he approached Cartwright's vehicle. See Smith, 645 F.3d at 1003 (finding an officer's actions can be reasonable under the Fourth Amendment if there is an objectively reasonable concern for officer safety or suspicion of danger).

[¶ 19]  For the foregoing reasons, the Court concludes the statements volunteered by Cartwright regarding the gun for drugs deal were not the result of custodial interrogation. A Miranda warning was not required at this time.

### III.  Cartwright's Waiver of His Miranda Rights.

[¶ 20]  Cartwright argues the Miranda warning was ineffective because (1) it was read so quickly Cartwright could not understand the warning; and (2) Chief Schmidt was required to ask if Cartwright understood the warning. Doc. No. 41 at 10. The Court disagrees with Cartwright.

[¶ 21]  Citizens are not required to be a witness against themselves, maintain a right to remain silent, and have the right to be warned when under custodial interrogation initiated by law enforcement. Const. amend. V.; Miranda, 384 U.S. at 444; Rooney, 63 F.3d at 1167. Miranda rights may be "voluntarily, knowingly, and intelligently" waived. United States v. Magallon, 984 F.3d 1263, 1282 (8th Cir. 2020). There is no "formalistic procedure" for a suspect to waive their Miranda rights. Berghuis v. Thompkins, 560 U.S. 370, 385 (2010). "[Q]uestions concerning

waiver are not susceptible to per se rules but must be reviewed based on the circumstances surrounding the interrogation." U.S. v. House, 939 F.2d 659, 662 (8th Cir. 1991). The words and actions of those interrogated allow courts to infer a waiver of Miranda rights. Berghuis, 560 U.S. at 387. "The Miranda rule and its requirements are met if a suspect receives adequate Miranda warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions." Id.

[¶ 22]   Here, after Cartwright stated his purpose for being at the gas station, Chief Schmidt clearly recited the Miranda warning to Cartwright. Doc. No. 43-2 at 1:43-57. Chief Schmidt's recitation of Miranda was quick but clear. Chief Schmidt testified at the hearing it appeared Cartwright understood and waived his Miranda rights by responding to his questions. Cartwright acknowledged the warning and nodded in agreement during its recitation. Id. After Chief Schmidt directly asked if there was anything illegal in the vehicle, Cartwright answered affirmatively, paused, then told Chief Schmidt there was a firearm in the vehicle. Id. at 2:00. Chief Schmidt continued asking about the location of the firearm and demonstrated knowledge that Cartwright is a felon prohibited from possessing the firearm. Id. at 2:00-17. At no point did Cartwright object to the questioning or show any signs he was unaware of his rights. These facts all show Cartwright freely and voluntarily implicitly waived his Miranda rights.

[¶ 23]   Accordingly, the Court concludes the Miranda warning as given was sufficient and the circumstances show the Defendant waived his Miranda rights when he freely chose to answer Chief Schmidt's questions. See Berghuis, 560 U.S. at 387 (finding courts are allowed to infer a waiver of Miranda based upon conduct of the defendant).

### a. Public Safety Exception to the <u>Miranda</u> requirements.

[¶ 24] The United States argues even if the questions posed by Chief Schmidt did require a <u>Miranda</u> warning, the public safety exception applies in this case. Doc. 43 at 4-6. The Court agrees with the United States.

[¶ 25] Police officers facing potential threats to public safety or themselves may ask questions "reasonably prompted" by their concerns without <u>Miranda</u> being required. <u>New York v. Quarles</u>, 467 U.S. 649, 656 (1984); <u>see also</u> <u>United States v. Liddell</u>, 517 F.3d 1007, 1009-10 (8th Cir. 2008) ("[T]he risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search."); <u>United States v. Becerra</u>, 958 F.3d 725, 730 (8th Cir. 2020) (finding officers were reasonably prompted to ask questions about defendant's gun based on his confession).

[¶ 26] The presence of a fully automatic firearm reasonably poses a threat to officer and public safety. Chief Schmidt knew of Cartwright's criminal history and violent, erratic behavior from drug use. Cartwright already volunteered he was there to conduct a "deal" for law enforcement. Doc. 43-2 at 0:50-1:08. However, Chief Schmidt had no knowledge of any controlled exchange set up by local law enforcement. Chief Schmidt was reasonably prompted to question Cartwright about the "deal" and entered the vehicle to retrieve the firearm. <u>Quarles</u>, 467 U.S. at 656. The questions asked were meant to aid public safety and fall outside the <u>Miranda</u> requirement. <u>United States v. Jones</u>, 842 F.3d 1077, 1082 (8th Cir. 2016) ("[The public safety] exception permits a suspect's answer be admitted into evidence even if he had not been read his <u>Miranda</u> rights so long as the purpose of the officer's question was to ensure public safety, not merely to elicit evidence.").

[¶ 27] While Chief Schmidt left the firearm in Cartwright's vehicle when he drove around the parking lot, it was only after he found the firearm and confirmed it could not be used that he returned to his patrol car. Id.; United States v. Harris, 747 F.3d 1013, 1019 (8th Cir. 2014) ("In the course of an encounter, police officers may take steps reasonably necessary to protect their personal safety." (citing United States v. Morgan, 729 F.3d 1086, 1091 (8th Cir. 2013)). This is a reasonable measure given the circumstances. Upon review of the facts of this case, the Court concludes the public safety exception applies.

### IV. The Two-Step Interrogation Method Was Not Used.

[¶ 28] Cartwright argues Chief Schmidt intentionally used a two-step interrogation technique in order to skirt the Miranda requirement and obtain a confession from him. Missouri v. Siebert, 542 U.S. 600 (2004); Doc. No. 41 at 11. The United States did not address this issue in their response. Doc. No. 67. The Court disagrees with the Defendant.

[¶ 29] In Siebert, the Supreme Court took issue with officers intentionally interrogating suspects in successive, unwarned and warned phases in order to secure a confession, avoid the Miranda requirements, and have the confession be admissible at trial. See Siebert, 542 U.S. at 609 (noting Miranda warnings given mid-interrogation, after the defendant gave unwarned confession, were ineffective, and thus confession repeated after warnings were given was inadmissible at trial). "[W]hen a defendant moves to suppress a post-warning statement [] he contends was given as part of a [two-step] interrogation, the prosecution must prove, by a preponderance of the evidence, that the officer's failure to provide warnings at the outset of questioning was not [done deliberately] to circumvent Miranda." United States v. Ollie, 442 F.3d 1135, 1142-43 (8th Cir. 2006).

[¶ 30] While the United States does not address this issue in their reply, there was no need as the facts of this case are clear. Cartwright voluntarily admitted at the outset of the stop he was there to

perform a "gun-for-drugs deal" without being prompted by Chief Schmidt. Chief Schmidt did not employ a two-step interrogation because he had no opportunity to do so. It was also not Chief Schmidt's purpose to avoid the Miranda requirements. Chief Schmidt did not even finish a question before Cartwright blurted out a confession. Therefore, the Court concludes even though the United States did not discuss this issue, it is abundantly clear a two-step interrogation approach was not used as Cartwright voluntarily gave the information. See Bailey, 831 F.3d at 1038 ("Voluntary statements unprompted by interrogation are admissible with or without Miranda warnings.").

> V.     The Traffic Stop Was Not Unreasonably Prolonged.

[¶ 31]   The Defendant argues Chief Schmidt illegally prolonged the stop and his detention because Chief Schmidt did not have probable cause of illegal activity before the stop and lacked reasonable suspicion of drug related activity before the stop. Doc. No. 67. The United States did not respond to this contention. Doc. No. 43. The Court disagrees with the Defendant.

[¶ 32]   A traffic stop is a reasonable seizure if it is "supported by either reasonable suspicion or probable cause." United States v. Allen, 43 F.4th 901, 908 (8th Cir. 2022). Once a vehicle is stopped based on reasonable suspicion or probable cause, officers may continue the stop only for the time necessary to attend to the stop's mission and related safety concerns. Id. (quoting Rodriguez v. United States, 575 U.S. 348, 354 (2015)) (internal quotations omitted). Thus, officers may continue the stop while they complete tasks related to the stop, such as checking the vehicle's registration and insurance, checking the occupants' names and criminal histories, preparing the citation, and asking routine questions. United States v. Murillo-Salgado, 854 F.3d 407, 415 (8th Cir. 2017). Generally, a valid traffic stop becomes an unreasonable seizure if the officer extends the stop beyond the time necessary to complete the stop's mission. Soderman, 983 F.3d at 374.

However, the officer may extend the stop if they develop reasonable suspicion of criminal activity. United States v. Davis, 943 F.3d 1129, 1132 (8th Cir. 2019).

[¶ 33]   Here, the questions asked by Chief Schmidt were routine and did not extend the stop beyond its initial purpose. Cartwright then volunteered he was there to trade a firearm for drugs. This, combined with the fact Chief Schmidt found a firearm in the possession of a known felon, is an adequate basis to reasonably extend the stop. See Davis, 943 F.3d at 1132 (finding an officer may extend the stop if they have reasonable suspicion a crime has occurred). In totality, this clearly meets the reasonable suspicion standard.

[¶ 34]   While Chief Schmidt took approximately eighty seconds to move his vehicle, the purpose was to ensure his own safety and to observe Cartwright's vehicle in the event an additional suspect arrived to perform the deal. See Harris, 747 F.3d at 1019 ("In the course of an encounter, police officers may take steps reasonably necessary to protect their personal safety."); Doc. No. 43-1. This is perfectly reasonable given the circumstances, and is not enough to say the stop was unreasonably prolonged as it was based upon officer safety and articulable, objective facts of criminal activity. Id.; see also Glover, 140 S. Ct. at 1187 ("Reasonable suspicion exists when an officer has a 'particularized and objective basis for suspecting the particular person stopped of breaking the law.'" (quoting Heien, 574 U.S. at 60)). The Court concludes the stop was not unreasonably prolonged longer than necessary to effectuate its purpose.

## CONCLUSION

[¶ 35]   For the reasons set forth above, the Defendant's Motion to Suppress (Doc. No. 41) is **DENIED**.

[¶ 36]  **IT IS SO ORDERED.**

DATED September 6, 2023.

_____
Daniel M. Traynor, District Judge
United States District Court